**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CABOT LODGE SECURITIES, LLC, | **No. 1:23-cv-15851** |
| Plaintiff, | **COMPLAINT** |
| v. | **Jury Trial Demanded** |
| STOLTMANN LAW OFFICES, P.C., | |
| Defendant. | |

Through undersigned counsel, Plaintiff Cabot Lodge Securities, LLC ("**Cabot**" or the "**Brokerage**") files this "**Complaint**" against Defendant "**Stoltmann**" Law Offices, P.C.:

1.    Defendant Stoltmann advertises itself as a "Chicago Investment Fraud Attorneys Offering Nationwide Representation to Investors."

2.    Stoltmann represents 47 "**Arbitration Claimants**" in two separate, active FINRA "**Arbitrations**" that Stoltmann caused those customers to initiate against Cabot.

3.    Stoltmann induced non-party Ann Louise Werts into misappropriating Cabot's "**Proprietary Protected Information**"—including "**Account Documents**," "**Confidential Information**," and "**Trade Secrets**" defined in Ms. Werts's "**Contract**" with Cabot—so that Stoltmann could file dozens of contingency cases against Cabot.

4.    Despite her duties to Cabot, non-party Ann Louise Werts introduced all of those Arbitration Claimants to Stoltmann, trading Cabot's Protected Proprietary Information in exchange for Stoltmann leaving her out of the Arbitrations.

5.      Because Stoltmann violated trade secrets laws and Illinois's Rules of Professional Conduct—and in doing so, caused Ms. Werts to breach her Contract with and duties to Cabot and Cabot's customers—Cabot sues Stoltmann.

<strong>The Parties, Jurisdiction, and Venue</strong>

6.      This Court may exercise original jurisdiction pursuant to 28 U.S.C. § 1331 because Stoltmann violated 18 U.S.C. § 1836.

7.      This Court may exercise supplemental jurisdiction over Cabot's remaining claims, which are intertwined with its federal claim.

8.      Plaintiff Cabot is a full-service broker–dealer licensed with the Financial Industry Regulatory Authority ("**FINRA**") and registered with the Securities and Exchange Commission ("**SEC**").

9.      Cabot is a Delaware limited liability corporation headquartered in Manhattan, New York.

10.     Defendant Stoltmann is an Illinois professional corporation.

11.     Its only offices are in Chicago, Hoffman Estates, and Downers Grove, Illinois.hoffma

12.     Stoltmann's entire practice is devoted to plaintiff- and claimant-side securities litigation and arbitration.

13.     Nearly every single firm that Stoltmann sues is headquartered in New York County or incorporated in New York.

14.     Nearly every single public security that is the subject of a Stoltmann-filed claim trades on Nasdaq or the New York Stock Exchange in Manhattan, New York.

15.     And nearly every single private security that is the subject of a Stoltmann-filed claim is offered, purchased, or sold in Manhattan, New York.

16.     Without targeting New York City residents and businesses, Stoltmann would have to close shop.

17.     As detailed further below, Stoltmann's illegal acts have caused Cabot at least $1,175,000 in damages.

18.     Venue and personal jurisdiction are proper because Stoltmann resides in this district.

### Non-Party Ann Louise Werts Agreed to Protect Cabot's Protected Proprietary Information, Including Cabot's Customer Data

19.     Individuals who earn commission compensation for selling securities must, inter alia, acquire licenses from and register with FINRA as "associated persons" of FINRA member firms like Cabot.

20.     Ms. Werts has been registered and associated with FINRA member firms from 1987 through 2000, 2002 through 2003, and 2009 through the present.

21.     In 2013, Ms. Werts needed to find a new FINRA member brokerage firm, and approached Cabot about working together to maintain her profession and licenses.

22.     Relying on Ms. Werts's claims to have particular expertise in advising current and former federal employees on maximizing their government employee and retirement benefits, Cabot agreed to sponsor her FINRA registration.

23.     Accordingly, on June 13, 2013, Ms. Werts and Cabot entered into their Financial Advisor Independent Contractor Agreement (the "**Contract**").

24.     Among other terms highly favorable to Ms. Werts, the Contract provided that (a) Ms. Werts was an independent contractor of Cabot and (b) Cabot would pay Ms. Werts up to **90%** of commissions on Cabot customer investments solicited by Ms. Werts.

25.     The Contract also contained industry-standard terms that required Ms. Werts to protect Cabot's Protected Proprietary Information and Cabot customers' privacy.

**American Securities Firms Safeguard Customer Information and Other Trade Secrets**

26.     Because customer relationships are the lifeblood of any brokerage firm or investment adviser, nearly every single American broker–dealer and investment adviser has safeguarded its client lists and contact information through law, contract, litigation, and arbitration.

27.     At the same time, registered representatives like Ms. Werts routinely change their brokerage affiliations.

28.     Accordingly, American courts and arbitral tribunals have adjudicated thousands of client trade secrets cases over the decades, commonly called "raiding" cases.

29.     Registered representatives and their respective brokerage firms fight over client lists so frequently that in 2004, major American brokerage firms signed a "**Broker Protocol**" to minimize the disputes they would have moving forward.

30.     Before the Broker Protocol, registered representatives typically would work in secret to find new firms with which to associate; announce their departures at 4:59pm on Friday; and then spend the weekend racing to contact and convert as many clients as

possible to their new firm, while their prior broker–dealer retained counsel and filed complaints and moved for temporary restraining orders and preliminary injunctions.

31.     These raiding cases became even more serious with the early 2000s dot-com crash.

32.     The SEC's 2003 implementation of Regulation S-P escalated these routine disputes: now, registered representatives who moved to new firms not only were breaching their contracts, but also violating federal privacy laws.

33.     To de-escalate the constant raiding disputes, the Broker Protocol allowed covered registered representatives to bring specifically-enumerated information—and only that information—to their new firms.

34.     The Broker Protocol allowed representatives to take **only** client (1) names, (2) addresses, (3) phone numbers, (4) email addresses, and (5) account titles.

35.     The Broker Protocol expressly prohibited registered representatives from taking any other information to their new firms.

36.     While the Broker Protocol was always a voluntary agreement among brokerage firms and investment advisers, for years, it was so widely-adopted that it was well-known and understood in the securities industry.

37.     The Broker Protocol's popularity peaked at approximately 1,700 firms around 2017.

38.     But in 2017, Morgan Stanley, Citibank, and UBS separately announced that they would leave the Protocol and would again sue representatives who solicited clients to join them at their new firms.

39.     It did not take long for the Protocol to fall apart.

40.     In fact, by April 2019, FINRA issued guidance recognizing that so many firms had withdrawn from the Protocol that registered representatives again had virtually no ability to retain customer contact information upon departure from their firms. See FINRA, Regulatory Notice 19-10 (Apr. 5, 2019).

41.     In any event, the Protocol only ever applied to signatory firms, and had never allowed registered representatives to take more than their customer's names, addresses, phone numbers, email addresses, and account titles.

42.     Even at the height of Protocol adoption, brokerage firms were free to sue registered representatives for taking any additional information after ceasing their association.

### Cabot Only Worked with Ms. Werts Because She Promised to Protect Cabot's Trade Secrets and Cabot's Customers' Privacy

43.     Cabot is just like any other firm: customer relationships and information are its most valuable assets.

44.     Without customers, a firm simply cannot exist.

45.     Accordingly, Cabot made sure that all registered representatives, including Ms. Werts, executed Contracts that prohibited the representatives from misappropriating Cabot's Protected Proprietary Information or violating Cabot customers' privacy.

46.      Cabot's relationship with Ms. Werts was no different.

47.     Cabot's Protected Proprietary Information and Cabot customers' privacy were material to Cabot's agreement to work with Ms. Werts.

48. Cabot never would have agreed to work with Ms. Werts unless it believed that she would protect Cabot's Protected Proprietary Information.

49. Cabot dedicates significant resources to cultivating potential customers, servicing current customers, and safeguarding all customers' private information.

50. Customers' purchase and investment history, financial records, investment objectives, and investment preferences all are crucial data that are proprietary to and closely held by Cabot.

51. Cabot treats all customer information as proprietary and as confidential trade secrets.

52. Cabot is not alone: the value of customer lists is well-established on Wall Street and in finance.

53. Cabot further secures its Protected Proprietary Information and customers' privacy by holding all of its customer information with either RBC or Pershing, which, as custodial firms, maintain the highest level of data protection and security.

54. Besides Cabot's business interests in safeguarding the Protected Proprietary Information, Regulation S-P also requires Cabot to protect customers' information.

55. To serve both its business interests and regulatory requirements, Cabot regularly audits its digital practices to ensure data protection and secrecy.

56. Moreover, the only Cabot personnel with access to all Protected Proprietary information are FINRA-registered principals, compliance, and supervision personnel.

57.     Those people can only access the Protected Proprietary Information with special, individualized password codes.

58.     Furthermore, Cabot tracks all access history of the Protected Proprietary Information.

59.     Therefore, the Contract's definition of "Confidential Information" protects all Cabot customer data, and contains several pages of clauses emphasizing Ms. Werts's confidentiality duties.

60.     For example, by executing the Contract, Ms. Werts represented and warranted that she "ha[d] not violated any privacy policy of any other broker / dealer with whom [she] ha[d] previously associated" and that in executing and performing pursuant to the Contract, Ms. Werts would not "violate or[] breach[] any agreement with a former employer, client or any other person or entity."

61.     Ms. Werts also promised that she would protect Cabot's "customer lists," "Account Documents, "Confidential Information," and "Trade Secrets."

62.     Ms. Werts specifically promised to protect "all documents and records relating to any [CLS customer] Account," i.e., "each and every C[abot] and C[abot] Group account, customer, client, lead or prospect."

63.     Ms. Werts further agreed she would never "divulge to anyone (except as required by law), use, retain copies of or seek to benefit personally from any Protected Proprietary Information, Trade Secret or intellectual property of C[abot]," including Cabot's customer lists.

64.     Cabot so closely guards its Protected Proprietary Information that multiple provisions of the Contract require Ms. Werts to comply with its confidentiality provisions even after the independent contractor relationship ended and the Contract terminated.

**Ms. Werts Sold Cabot's Protected Proprietary Information to Stoltmann**

65.     In 2021, Ms. Werts claimed that she wanted to wind down her business and retire; terminated the Contract and her association with Cabot; and became registered with FINRA member and non-party Madison Avenue Securities, LLC ("**Madison Avenue**").

66.     Despite its name, Madison Avenue is a Delaware corporation headquartered in San Diego.

67.     Ms. Werts is currently registered with Madison Avenue's Lakewood, Colorado office.

68.     During her association with Cabot, Ms. Werts maintained relationships with scores of Cabot customers, particularly focusing virtually all her efforts on older and retired federal employees.

69.     From 2017 through 2020, Ms. Werts solicited dozens of Cabot customers' investments in L Bonds issued by non-party GWG Holdings, Inc. ("**GWG**"), including bonds that promised to (a) pay 5.5% interest and mature after two years, (2) pay 6.25% interest and mature after three years, or (3) pay 8.5% interest and mature after seven years (the "**GWG L Bonds**").

70.     Despite its promises, GWG stopped making the Bonds' interest and maturity payments in January 2022; in April 2022, GWG filed for Chapter 11 bankruptcy.

71.     By January 25, 2022, Stoltmann began fishing for GWG L Bonds investors who would be willing to sue their brokerage firms. See Stoltmann, <u>Default on the GWG Holdings Inc. L Bonds is Imminent after Missing January 15, 2022 Interest and Principal Payments of $13.6 Million</u> (Jan. 25, 2022), <u>https://stoltmannlaw.com/default-on-the-gwg-holdings-inc-l-bonds-is-imminent-after-missing-january-15-2022-interest-and-principal-payments-of-13-6-million/</u>.

72.     While Stoltmann's self-published advertisement did not name Cabot as a potential target, it did try to scare securities customers into hiring the firm:

> Stoltmann Law Offices is representing investors whose brokers or financial advisors sold them GWG[] L Bonds. Brokerage firms, including but not limited to Aegis Capital [ . . . ] Any type of investment in the secondary life insurance market is an extremely risky investment, and these bonds certainly were not suitable for many, if any, clients. Given recent events, default on the L Bonds seems to be imminent, and may leave investors with a total loss of their investments. [ . . . ]

> If your broker or financial advisor sold you the GWG L Bonds, it is important for you to contact an attorney immediately. If the financial situation of the GWG L Bonds is as bad as it seems, there will be a tsunami of litigation against the brokerage firms and advisors that sold these speculative bonds to their clients, and you will want your case at the front of the line.

73.     Soon thereafter, Stoltmann identified Cabot and Ms. Werts as "brokerage firm[] and advisor[]" targets for GWG L Bonds lawsuits.

74.     Stoltmann had just one problem: without actual customers who had standing to sue, Stoltmann could not make any money off GWG's bankruptcy.

75.     Therefore, Stoltmann deployed its scare tactics against Ms. Werts, herself.

76. In spring 2022, upon information and belief, Stoltmann reached out to and directly and indirectly induced Ms. Werts to give Stoltmann Cabot's Protected Proprietary Information.

77. Upon information and belief, Stoltmann threatened that it would cause claimants to sue Ms. Werts unless she gave Stoltmann the names, contact information, and investment details of Cabot customers who had invested in the GWG L Bonds.

78. Ms. Werts agreed to trade Cabot's Protected Proprietary Information in exchange for Stoltmann's promises that it would not sue her.

79. Ms. Werts had not just taken client names and addresses; she had exported the entirety of Cabot's client files from Cabot's in-house software.

80. Besides client contact information, Ms. Werts also took copies of all of the customer-specific paperwork that Cabot had stored in its own software and systems.

81. Upon information and belief, Ms. Werts forwarded those files on to Stoltmann.

82. In early 2022, Ms. Werts sent Stoltmann's contact information to her subordinates.

83. Ms. Werts told her subordinates that all communications regarding GWG and the L Bonds must be oral, and never in writing.

84. At Ms. Werts's direction, Ms. Werts's associates called the Cabot customers to provide them with Stoltmann's contact information.

85. Ms. Werts also emailed dozens of Cabot customers whose GWG L Bond investments she had solicited.

86. For example, in May 2022, Ms. Werts emailed "**Cabot Customer 1**:"

[W]e know you may be getting multiple communications from law firms about GWG claims against brokerage firms.

While we cannot advise you on the correct course of action, a law firm contacted us about an informational seminar that they are hosting about the GWG bankruptcy and pursuing claims against brokerage firms. This seminar is Wednesday, June 1, at 1pm MDT and is available through the following link:

[Zoom link]

We are providing this information to you for informational purposes. We are not co-hosting this seminar and are not involved with this law firm.

87. That law firm was Stoltmann.

88. Besides breaching her confidentiality obligations to Cabot, Ms. Werts just plain lied to Cabot customers: the suggestion that Ms. Werts was "not co-hosting this seminar and [was] not involved with [Stoltmann]" was nonsense.

89. The only reason why Ms. Werts's email pretended that plaintiffs' firms advertised that they would pursue GWG claims "against brokerage firms" and only brokerage firms **because** she had traded Cabot's Protected Proprietary Information for Stoltmann's assurances that the firm would leave her out of any ensuing lawsuits.

90. In comparison, Stoltmann's own GWG L Bonds advertisement pushes customers to sue both "broker[s] and financial advisor[s]"—i.e., both Cabot and Ms. Werts.

91. And exactly one month after the Zoom seminar jointly hosted by Stoltmann and Ms. Werts, a customer who chose to work with a different law firm sued both Cabot

and Ms. Werts, alleging that the GWG L Bonds were unsuitable for that customer's investment objectives.

92.     In fact, between July 1, 2022 and March 7, 2023, customers represented by lawyers other than Stoltmann initiated eight separate FINRA arbitrations against Ms. Werts.

93.     Ms. Werts's public FINRA BrokerCheck profile suggests that in all eight arbitrations, Cabot customers have sued Ms. Werts for soliciting their investments in the GWG L Bonds.

94.     Stoltmann, meanwhile, has caused 47 separate Cabot customers to sue Cabot—and only Cabot—for soliciting their investments in the GWG L Bonds.

95.     Despite purportedly representing those CLS customers' best interests—and despite knowing that Ms. Werts personally received approximately 90% of the GWG L Bonds commissions—Stoltmann did not sue Ms. Werts.

96.     Standard industry practice and Stoltmann's own history is to sue both (1) brokerage firms and (2) registered representatives when securities customers argue that investments were unsuitable.

97.     Yet Stoltmann left Ms. Werts out of the Arbitrations, in which Stoltmann, has claimed that those 47 Cabot customers' damages exceed $4 million.

98.     Stoltmann's refusal to sue Ms. Werts is particularly telling because she personally received approximately **90%** of the GWG L Bond commissions, while Cabot kept approximately ten percent.

99.     The **only** reason that Stoltmann did not sue Ms. Werts was because she gave them Cabot's Protected Proprietary Information, connecting the law firm to dozens of Cabot customers to whom Stoltmann never would have had any access, if not for Ms. Werts.

### Stoltmann Knew that it was Making Ms. Werts Breach the Cabot Contract and Violate Cabot's Customers' Privacy

100.     There can be no doubt that Stoltmann knew that (1) the Contract between Ms. Werts and Cabot existed and (2) the Contract prohibited Ms. Werts from misappropriating, divulging, or otherwise abusing Cabot's Protected Proprietary Information, including its customer lists and customers' contact information.

101.     Stoltmann advertises its "combined 35 years of experience fighting for investor rights" and "successful[] prosecut[ion of] well over a thousand FINRA arbitration cases and lawsuits on behalf of defrauded investors." See Stoltmann Law (Mar. 27, 2023), https://stoltmannlaw.com/.

102.     Stoltmann also claims that its attorneys "have dedicated their life's work to representing investors who have been cheated or defrauded by those professionals they trusted with their hard-earned money and retirement savings, recovering in excess of $50 million for investors over the years."

103.     Stoltmann further boasts that it "exclusively represents investors from across the country in securities litigation and arbitration actions including claims for fraud, unsuitable investment recommendations, excessive trading, churning, unauthorized trading, breach of fiduciary duty, and misrepresentations and omissions."

104.     Besides those classic securities customer claims, Stoltmann also claims to represent "individuals and business in contract disputes in all areas of business and for business of all sizes," explaining, "[t]ypically[,] a breach of contract occurs when a party fails to perform under the terms of the contract."

105.     Stoltmann purports to practice "Intellectual Property" law, explaining, "[w]e can help you register, protect, license, and enforce your business's intellectual property rights."

106.     Stoltmann also offers to represent plaintiffs in "Business Tort Litigation," which Stoltmann defines as "claims that are business disputes that are not contract-based. Business torts provide the common law rules on liability that arise out of business transactions such as interference with economic or business relationships."

107.     Finally, Stoltmann also advertises its "Employment Law" practice by claiming, "Our firm helps employees navigate complex legal matters by providing them with expert legal advice on all issues related to the workplace."

108.     In short, Stoltmann's own website compels the conclusions that Stoltmann knew (1) Ms. Werts had a Contract with Cabot, (2) that Contract prohibited Ms. Werts from sharing Cabot's Protected Proprietary Information with anyone, and (3) the Contract even more specifically prohibited Ms. Werts from helping Stoltmann abuse Cabot's Protected Proprietary Information in order to attack Cabot.

109.     FINRA registered representatives generally enter into written contracts with FINRA member firms.

110.    Those contracts uniformly include provisions that prohibit registered representatives from (1) divulging, abusing, or otherwise profiting from brokerage firms' Protected Proprietary Information, including firms' customers' information or (2) interfering with firms' customer relationships.

111.    Indeed, these contracts' provisions are so notorious that they caused the creation of the Broker Protocol, continued to exist while the Protocol was widely-adopted, and, at this point, have outlived the Protocol.

112.    In any event, the Protocol never allowed registered representatives to take more than the five pieces of specifically-enumerated information, let alone export **all** files held by a representative's former firm.

113.    Nor did the Protocol ever allow representatives to use that information for any purpose but to attempt to bring customers over to their new brokerage firms.

114.    The Protocol certainly never allowed or encouraged representatives to steal confidential or proprietary information and hand it to people who would abuse that information against the originating firm.

115.    There can be no doubt that with "35 years of experience" prosecuting "well over a thousand FINRA arbitration cases and lawsuits on behalf of defrauded investors," Stoltmann knew that the Contract prohibited Ms. Werts from misappropriating Cabot's Protected Proprietary Information.

116.    Moreover, Stoltmann had specific knowledge of this particular Contract because Ms. Werts and / or her agents, including her personal attorneys, told Stoltmann about the Contract.

117.    By encouraging Ms. Werts to breach the Contract, Stoltmann violated Illinois Rule of Professional Conduct 4.4, which states that "[i]n representing a client, a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of [third] person[s]."

118.    Stoltmann also violated Illinois Rule of Professional Conduct 7.3, which states that "[a] lawyer shall not by in–person, live telephone or real–time electronic contact solicit professional employment when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain."

119.    Accordingly, Cabot sues Stoltmann.

## CLAIMS

### COUNT I
### Federal Defend Trade Secrets Act

120.    Cabot repeats its foregoing allegations.

121.    Cabot's Protected Proprietary Information includes "trade secrets" as defined by the Defend Trade Secrets Act.

122.    Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

123.    In doing so, Stoltmann has caused Cabot irreparable harm that warrants injunctive relief, as well as damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

## COUNT II
## Colorado Uniform Trade Secrets Act

124.    Cabot repeats its foregoing allegations.

125.    Cabot's Protected Proprietary Information includes "trade secrets" as defined by the Colorado Uniform Trade Secrets Act.

126.    Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

127.    In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

## COUNT III
## Delaware Uniform Trade Secrets Act

128.    Cabot repeats its foregoing allegations.

129.    Cabot's Protected Proprietary Information includes "trade secrets" as defined by the Delaware Uniform Trade Secrets Act.

130.    Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

131.    In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

## COUNT IV
### Illinois Uniform Trade Secrets Act

132.     Cabot repeats its foregoing allegations.

133.     Cabot's Protected Proprietary Information includes "trade secrets" as defined by the Illinois Uniform Trade Secrets Act.

134.     Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

135.     In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

## COUNT V
### Tortious Interference with Contract

136.     Cabot repeats its foregoing allegations.

137.     Stoltmann knew that Ms. Werts was contractually obligated to protect Cabot's Protected Proprietary Information.

138.     Yet Stoltmann induced Ms. Werts into providing Cabot's Protected Proprietary Information in violation of the Contract.

139.     In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

## COUNT VI
### Tortious Interference with Business Relations

140.    Cabot repeats its foregoing allegations.

141.    Stoltmann knew that Ms. Werts was contractually obligated to protect Cabot's Protected Proprietary Information.

142.    Yet Stoltmann induced Ms. Werts into providing Cabot's Protected Proprietary Information in violation of the Contract.

143.    Then, Stoltmann reached out to Cabot's customers to encourage them to attempt to hold Cabot liable for their losses instead of the two parties who could possibly bear such responsibility: GWG, which failed and filed for bankruptcy, and Ms. Werts, who solicited each customer's investment in the GWG L Bonds and pocketed approximately 90% of the profits.

144.    Stoltmann had no good basis to poison Cabot's relationships with its customers.

145.    In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

## COUNT VII
## Misappropriation

146.     Cabot repeats its foregoing allegations.

147.     Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

148.     Stoltmann did so in order to deprive Cabot of its priceless information and use it for Stoltmann's own pecuniary gain.

149.     In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

## COUNT VIII
## Conversion

150.     Cabot repeats its foregoing allegations.

151.     Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

152.     Stoltmann did so in order to deprive Cabot of its priceless information and use it for Stoltmann's own pecuniary gain.

153.     In doing so, Stoltmann has damaged CLS in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

**RELIEF REQUESTED**

CLS requests the following relief:

(i)     Damages and / or restitution in an amount to be determined at
        trial, totaling no less than $1,175,000;

(ii)    Preliminary and permanent injunctive relief;

(iii)   Exemplary and punitive damages;

(iv)    Contractual costs and attorneys' fees; and

(v)     All costs and attorneys' fees, incidental and consequential relief,
        and all other relief that the Court finds just and proper.


Dated: November 10, 2023
     New York, New York

         Respectfully submitted,

         **GUSRAE KAPLAN NUSBAUM PLLC**

         /s/Kari Parks
         Kari Parks
         120 Wall Street
         New York, New York 10005
         (212) 269-1400
         kparks@gusraekaplan.com

         *Counsel for Plaintiff Cabot Lodge Securities, LLC*