**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **CABOT LODGE SECURITIES, LLC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:23-cv-15851** |
| ) | |
| **STOLTMANN LAW OFFICES, P.C.,** ) | |
| ) | |
| **Defendant.** ) | |

## DEFENDANT'S ANSWER AND DEFENSES

Pursuant to Federal Rule of Civil Procedure 8(b) and this court's Local Rule 10.1, Defendant Stoltmann Law Offices, P.C. ("Stoltmann"), by and through its attorneys, for its Answer and Defenses to the Complaint filed by Plaintiff Cabot Lodge Securities, LLC. ("Cabot"), states as follows:

1. Defendant Stoltmann advertises itself as a "Chicago Investment Fraud Attorneys Offering Nationwide Representation to Investors."

   **ANSWER:** Stoltmann admits the allegations in this paragraph.

2. Stoltmann represents 47 "**Arbitration Claimants**" in two separate, active FINRA "Arbitrations" that Stoltmann caused those customers to initiate against Cabot.

   **ANSWER:** Stoltmann admits that it represents approximately 47 arbitration claimants in two active FINRA arbitrations. Stoltmann denies the remaining allegations in this paragraph.

3. Stoltmann induced non-party Ann Louise Werts into misappropriating Cabot's "**Proprietary Protected Information**"—including "**Account Documents**," "**Confidential Information**," and "**Trade Secrets**" defined in Ms. Werts's "**Contract**" with Cabot—so that Stoltmann could file dozens of contingency cases against Cabot.

**ANSWER:** Stoltmann denies the allegations in this paragraph.

4.  Despite her duties to Cabot, non-party Ann Louise Werts introduced all of those Arbitration Claimants to Stoltmann, trading Cabot's Protected Proprietary Information in exchange for Stoltmann leaving her out of the Arbitrations.

**ANSWER:** Stoltmann denies the allegations in this paragraph.

5.  Because Stoltmann violated trade secrets laws and Illinois's Rules of Professional Conduct— and in doing so, caused Ms. Werts to breach her Contract with and duties to Cabot and Cabot's customers—Cabot sues Stoltmann.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

### The Parties, Jurisdiction, and Venue

6.  This Court may exercise original jurisdiction pursuant to 28 U.S.C. § 1331 because Stoltmann violated 18 U.S.C. § 1836.

**ANSWER:** This allegation constitutes a conclusion of law to which no response is required. To the extent a response is required, Stoltmann denies the allegation contained in this paragraph.

7.  This Court may exercise supplemental jurisdiction over Cabot's remaining claims, which are intertwined with its federal claim.

**ANSWER:** This allegation constitutes a conclusion of law to which no response is required. To the extent a response is required, Stoltmann denies the allegation contained in this paragraph.

8.  Plaintiff Cabot is a full-service broker–dealer licensed with the Financial Industry Regulatory Authority ("**FINRA**") and registered with the Securities and Exchange Commission ("**SEC**").

2

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

9. Cabot is a Delaware limited liability corporation headquartered in Manhattan, New York.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

10. Defendant Stoltmann is an Illinois professional corporation.

**ANSWER:** Stoltmann admits the allegation contained in this paragraph.

11. Its only offices are in Chicago, Hoffman Estates, and Downers Grove, Illinois.

**ANSWER:** Stoltmann admits the allegations contained in this paragraph.

12. Stoltmann's entire practice is devoted to plaintiff- and claimant-side securities litigation and arbitration.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

13. Nearly every single firm that Stoltmann sues is headquartered in New York County or incorporated in New York.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

14. Nearly every single public security that is the subject of a Stoltmann-filed claim trades on Nasdaq or the New York Stock Exchange in Manhattan, New York.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

15. And nearly every single private security that is the subject of a Stoltmann-filed claim is offered, purchased, or sold in Manhattan, New York.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

16. Without targeting New York City residents and businesses, Stoltmann would have to close shop.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

17. As detailed further below, Stoltmann's illegal acts have caused Cabot at least $1,175,000 in damages.

**ANSWER:** This allegation constitutes a conclusion of law to which no response is required. To the extent a response is required, Stoltmann denies the allegation contained in this paragraph.

18. Venue and personal jurisdiction are proper because Stoltmann resides in this district.

**ANSWER:** This allegation constitutes a conclusion of law to which no response is required.

### Non-Party Ann Louise Werts Agreed to Protect Cabot's Protected Proprietary Information, Including Cabot's Customer Data

19. Individuals who earn commission compensation for selling securities must, inter alia, acquire licenses from and register with FINRA as "associated persons" of FINRA member firms like Cabot.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

20. Ms. Werts has been registered and associated with FINRA member firms from 1987 through 2000, 2002 through 2003, and 2009 through the present.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

21. In 2013, Ms. Werts needed to find a new FINRA member brokerage firm, and approached Cabot about working together to maintain her profession and licenses.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

22. Relying on Ms. Werts's claims to have particular expertise in advising current and former federal employees on maximizing their government employee and retirement benefits, Cabot agreed to sponsor her FINRA registration.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

23. Accordingly, on June 13, 2013, Ms. Werts and Cabot entered into their Financial Advisor Independent Contractor Agreement (the "**Contract**").

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

24. Among other terms highly favorable to Ms. Werts, the Contract provided that (a) Ms. Werts was an independent contractor of Cabot and (b) Cabot would pay Ms. Werts up to **90%** of commissions on Cabot customer investments solicited by Ms. Werts.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

25. The Contract also contained industry-standard terms that required Ms. Werts to protect Cabot's Protected Proprietary Information and Cabot customers' privacy.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

### American Securities Firms Safeguard Customer Information and Other Trade Secrets

26. Because customer relationships are the lifeblood of any brokerage firm or investment adviser, nearly every single American broker–dealer and investment adviser has safeguarded its client lists and contact information through law, contract, litigation, and arbitration.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in

this paragraph.

27. At the same time, registered representatives like Ms. Werts routinely change their brokerage affiliations.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

28. Accordingly, American courts and arbitral tribunals have adjudicated thousands of client trade secrets cases over the decades, commonly called "raiding" cases.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

29. Registered representatives and their respective brokerage firms fight over client lists so frequently that in 2004, major American brokerage firms signed a "**Broker Protocol**" to minimize the disputes they would have moving forward.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

30. Before the Broker Protocol, registered representatives typically would work in secret to find new firms with which to associate; announce their departures at 4:59pm on Friday; and then spend the weekend racing to contact and convert as many clients as possible to their new firm, while their prior broker–dealer retained counsel and filed complaints and moved for temporary restraining orders and preliminary injunctions.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

31. These raiding cases became even more serious with the early 2000s dot-com crash.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in

this paragraph.

32. The SEC's 2003 implementation of Regulation S-P escalated these routine disputes: now, registered representatives who moved to new firms not only were breaching their contracts, but also violating federal privacy laws.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

33. To de-escalate the constant raiding disputes, the Broker Protocol allowed covered registered representatives to bring specifically-enumerated information—and only that information—to their new firms.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

34. The Broker Protocol allowed representatives to take **only** client (1) names, (2) addresses, (3) phone numbers, (4) email addresses, and (5) account titles.

> **ANSWER:** The Broker Protocol is a writing that speaks for itself and Stoltmann denies any allegation that is inconsistent with such writing.

35. The Broker Protocol expressly prohibited registered representatives from taking any other information to their new firms.

> **ANSWER:** The Broker Protocol is a writing that speaks for itself and Stoltmann denies any allegation that is inconsistent with such writing.

36. While the Broker Protocol was always a voluntary agreement among brokerage firms and investment advisers, for years, it was so widely-adopted that it was well-known and understood in the securities industry.

> **ANSWER:** The Broker Protocol is a writing that speaks for itself and Stoltmann

7

denies any allegation that is inconsistent with such writing.

37. The Broker Protocol's popularity peaked at approximately 1,700 firms around 2017.

   **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

38. But in 2017, Morgan Stanley, Citibank, and UBS separately announced that they would leave the Protocol and would again sue representatives who solicited clients to join them at their new firms.

   **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

39. It did not take long for the Protocol to fall apart.

   **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

40. In fact, by April 2019, FINRA issued guidance recognizing that so many firms had withdrawn from the Protocol that registered representatives again had virtually no ability to retain customer contact information upon departure from their firms. See FINRA, Regulatory Notice 19-10 (Apr. 5, 2019).

   **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

41. In any event, the Protocol only ever applied to signatory firms, and had never allowed registered representatives to take more than their customer's names, addresses, phone numbers, email addresses, and account titles.

   **ANSWER:** This allegation constitutes a conclusion of law to which no response is required. To the extent a response is required, Stoltmann denies the allegation

contained in this paragraph.

42.   Even at the height of Protocol adoption, brokerage firms were free to sue registered representatives for taking any additional information after ceasing their association.

      **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

### Cabot Only Worked with Ms. Werts Because She Promised to Protect Cabot's Trade Secrets and Cabot's Customers' Privacy

43.   Cabot is just like any other firm: customer relationships and information are its most valuable assets.

      **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

44.   Without customers, a firm simply cannot exist.

      **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

45.   Accordingly, Cabot made sure that all registered representatives, including Ms. Werts, executed Contracts that prohibited the representatives from misappropriating Cabot's Protected Proprietary Information or violating Cabot customers' privacy.

      **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

46.   Cabot's relationship with Ms. Werts was no different.

      **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

47.   Cabot's Protected Proprietary Information and Cabot customers' privacy were material to Cabot's agreement to work with Ms. Werts.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

48.  Cabot never would have agreed to work with Ms. Werts unless it believed that she would protect Cabot's Protected Proprietary Information.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

49.  Cabot dedicates significant resources to cultivating potential customers, servicing current customers, and safeguarding all customers' private information.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

50.  Customers' purchase and investment history, financial records, investment objectives, and investment preferences all are crucial data that are proprietary to and closely held by Cabot.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

51.  Cabot treats all customer information as proprietary and as confidential trade secrets.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

52.  Cabot is not alone: the value of customer lists is well-established on Wall Street and in finance.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

53.  Cabot further secures its Protected Proprietary Information and customers' privacy by holding all of its customer information with either RBC or Pershing, which, as custodial firms, maintain the highest level of data protection and security.

10

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

54. Besides Cabot's business interests in safeguarding the Protected Proprietary Information, Regulation S-P also requires Cabot to protect customers' information.

**ANSWER:** This allegation constitutes a conclusion of law to which no response is required. To the extent a response is required, Stoltmann denies the allegation contained in this paragraph.

55. To serve both its business interests and regulatory requirements, Cabot regularly audits its digital practices to ensure data protection and secrecy.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

56. Moreover, the only Cabot personnel with access to all Protected Proprietary information are FINRA-registered principals, compliance, and supervision personnel.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

57. Those people can only access the Protected Proprietary Information with special, individualized password codes.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

58. Furthermore, Cabot tracks all access history of the Protected Proprietary Information.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

59. Therefore, the Contract's definition of "Confidential Information" protects all Cabot customer

data, and contains several pages of clauses emphasizing Ms. Werts's confidentiality duties.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

60. For example, by executing the Contract, Ms. Werts represented and warranted that she "ha[d] not violated any privacy policy of any other broker / dealer with whom [she] ha[d] previously associated" and that in executing and performing pursuant to the Contract, Ms. Werts would not "violate or[] breach[] any agreement with a former employer, client or any other person or entity."

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

61. Ms. Werts also promised that she would protect Cabot's "customer lists," "Account Documents, "Confidential Information," and "Trade Secrets."

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

62. Ms. Werts specifically promised to protect "all documents and records relating to any [CLS customer] Account," i.e., "each and every C[abot] and C[abot] Group account, customer, client, lead or prospect."

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

63. Ms. Werts further agreed she would never "divulge to anyone (except as required by law), use, retain copies of or seek to benefit personally from any Protected Proprietary Information, Trade Secret or intellectual property of C[abot]," including Cabot's customer lists.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

64. Cabot so closely guards its Protected Proprietary Information that multiple provisions of the Contract require Ms. Werts to comply with its confidentiality provisions even after the independent contractor relationship ended and the Contract terminated.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

### Ms. Werts Sold Cabot's Protected Proprietary Information to Stoltmann

65. In 2021, Ms. Werts claimed that she wanted to wind down her business and retire; terminated the Contract and her association with Cabot; and became registered with FINRA member and non-party Madison Avenue Securities, LLC ("**Madison Avenue**").

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

66. Despite its name, Madison Avenue is a Delaware corporation headquartered in San Diego.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

67. Ms. Werts is currently registered with Madison Avenue's Lakewood, Colorado office.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

68. During her association with Cabot, Ms. Werts maintained relationships with scores of Cabot customers, particularly focusing virtually all her efforts on older and retired federal employees.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

69. From 2017 through 2020, Ms. Werts solicited dozens of Cabot customers' investments in L Bonds issued by non-party GWG Holdings, Inc. ("**GWG**"), including bonds that promised to (a)

pay 5.5% interest and mature after two years, (2) pay 6.25% interest and mature after three years, or (3) pay 8.5% interest and mature after seven years (the "**GWG L Bonds**").

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

70. Despite its promises, GWG stopped making the Bonds' interest and maturity payments in January 2022; in April 2022, GWG filed for Chapter 11 bankruptcy.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

71. By January 25, 2022, Stoltmann began fishing for GWG L Bonds investors who would be willing to sue their brokerage firms. See Stoltmann, Default on the GWG Holdings Inc. L Bonds is Imminent after Missing January 15, 2022 Interest and Principal Payments of $13.6 Million (Jan. 25, 2022), https://stoltmannlaw.com/default-on-the-gwg-holdings-inc-l-bonds-is-imminent-after-missing-january-15-2022-interest-and-principal-payments-of-13-6-million/.

> **ANSWER:** Stoltmann denies the allegations in this paragraph.

72. While Stoltmann's self-published advertisement did not name Cabot as a potential target, it did try to scare securities customers into hiring the firm:

> Stoltmann Law Offices is representing investors whose brokers or financial advisors sold them GWG[] L Bonds. Brokerage firms, including but not limited to Aegis Capital [ . . . ] Any type of investment in the secondary life insurance market is an extremely risky investment, and these bonds certainly were not suitable for many, if any, clients. Given recent events, default on the L Bonds seems to be imminent, and may leave investors with a total loss of their investments. [ . . . ]
>
> If your broker or financial advisor sold you the GWG L Bonds, it is important for you to contact an attorney immediately. If the financial situation of the GWG L Bonds is as bad as it seems, there will be a tsunami of litigation against the brokerage firms and advisors that sold these speculative bonds to their clients, and you will want your case at the front of the line.

> **ANSWER:** The communication referenced in this paragraph is a writing that speaks

14

for itself and Stoltmann denies any allegation that is inconsistent with such writing.

73. Soon thereafter, Stoltmann identified Cabot and Ms. Werts as "brokerage firm[] and advisor[]" targets for GWG L Bonds lawsuits.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

74. Stoltmann had just one problem: without actual customers who had standing to sue, Stoltmann could not make any money off GWG's bankruptcy.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

75. Therefore, Stoltmann deployed its scare tactics against Ms. Werts, herself.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

76. In spring 2022, upon information and belief, Stoltmann reached out to and directly and indirectly induced Ms. Werts to give Stoltmann Cabot's Protected Proprietary Information.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

77. Upon information and belief, Stoltmann threatened that it would cause claimants to sue Ms. Werts unless she gave Stoltmann the names, contact information, and investment details of Cabot customers who had invested in the GWG L Bonds.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

78. Ms. Werts agreed to trade Cabot's Protected Proprietary Information in exchange for Stoltmann's promises that it would not sue her.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

79. Ms. Werts had not just taken client names and addresses; she had exported the entirety of Cabot's client files from Cabot's in-house software.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in

this paragraph.

80. Besides client contact information, Ms. Werts also took copies of all of the customer-specific paperwork that Cabot had stored in its own software and systems.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

81. Upon information and belief, Ms. Werts forwarded those files on to Stoltmann.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

82. In early 2022, Ms. Werts sent Stoltmann's contact information to her subordinates.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

83. Ms. Werts told her subordinates that all communications regarding GWG and the L Bonds must be oral, and never in writing.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

84. At Ms. Werts's direction, Ms. Werts's associates called the Cabot customers to provide them with Stoltmann's contact information.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

85. Ms. Werts also emailed dozens of Cabot customers whose GWG L Bond investments she had solicited.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

86. For example, in May 2022, Ms. Werts emailed "**Cabot Customer 1**:"

> [W]e know you may be getting multiple communications from law firms about GWG claims against brokerage firms.
>
> While we cannot advise you on the correct course of action, a law firm contacted us about an informational seminar that they are hosting about the GWG bankruptcy and pursuing claims against brokerage firms. This seminar is Wednesday, June 1, at 1pm MDT and is available through the following link:
>
> [Zoom link]
>
> We are providing this information to you for informational purposes. We are not
>
> co-hosting this seminar and are not involved with this law firm.
>
> **ANSWER:** The communication referenced in this paragraph is a writing that speaks
>
> for itself and Stoltmann denies any allegation that is inconsistent with such writing.

87. That law firm was Stoltmann.

> **ANSWER:** Stoltmann admits that in or around May 2022, it participated in a Zoom
>
> call with GWG L Bond investors in which the GWG bankruptcy and prospective
>
> claims against brokerage firms were discussed. Stoltmann lacks sufficient knowledge
>
> to admit or deny the remaining allegations in this paragraph.

88. Besides breaching her confidentiality obligations to Cabot, Ms. Werts just plain lied to Cabot customers: the suggestion that Ms. Werts was "not co-hosting this seminar and [was] not involved with [Stoltmann]" was nonsense.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in
>
> this paragraph.

89. The only reason why Ms. Werts's email pretended that plaintiffs' firms advertised that they would pursue GWG claims "against brokerage firms" and only brokerage firms **because** she had

traded Cabot's Protected Proprietary Information for Stoltmann's assurances that the firm would leave her out of any ensuing lawsuits.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

90. In comparison, Stoltmann's own GWG L Bonds advertisement pushes customers to sue both "broker[s] and financial advisor[s]"—i.e., both Cabot and Ms. Werts.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

91. And exactly one month after the Zoom seminar jointly hosted by Stoltmann and Ms. Werts, a customer who chose to work with a different law firm sued both Cabot and Ms. Werts, alleging that the GWG L Bonds were unsuitable for that customer's investment objectives.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

92. In fact, between July 1, 2022 and March 7, 2023, customers represented by lawyers other than Stoltmann initiated eight separate FINRA arbitrations against Ms. Werts.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

93. Ms. Werts's public FINRA BrokerCheck profile suggests that in all eight arbitrations, Cabot customers have sued Ms. Werts for soliciting their investments in the GWG L Bonds.

> **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

94. Stoltmann, meanwhile, has caused 47 separate Cabot customers to sue Cabot—and only Cabot—for soliciting their investments in the GWG L Bonds.

**ANSWER:** Stoltmann admits it represents 47 Cabot customers against Cabot for soliciting investments in GWG L Bonds. Stoltmann denies the remaining allegations in this paragraph.

95. Despite purportedly representing those CLS customers' best interests—and despite knowing that Ms. Werts personally received approximately 90% of the GWG L Bonds commissions—Stoltmann did not sue Ms. Werts.

**ANSWER:** Stoltmann admits it represents CLS customers against CLS who did not sue Ms. Werts. Stoltmann lacks sufficient knowledge to admit or deny the remaining allegations in this paragraph.

96. Standard industry practice and Stoltmann's own history is to sue both (1) brokerage firms and (2) registered representatives when securities customers argue that investments were unsuitable.

**ANSWER:** Stoltmann denies that it is its "own history… to sue both (1) brokerage firms and (2) registered representatives when securities customers argue that investments were unsuitable." Stoltmann lacks sufficient knowledge to admit or deny the remaining allegations in this paragraph.

97. Yet Stoltmann left Ms. Werts out of the Arbitrations, in which Stoltmann, has claimed that those 47 Cabot customers' damages exceed $4 million.

**ANSWER:** Stoltmann admits it represents 47 CLS customers against CLS who did not sue Mr. Werts. Stoltmann denies the remaining allegations in this paragraph.

98. Stoltmann's refusal to sue Ms. Werts is particularly telling because she personally received approximately **90%** of the GWG L Bond commissions, while Cabot kept approximately ten percent.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegations in this

paragraph.

99.   The **only** reason that Stoltmann did not sue Ms. Werts was because she gave them Cabot's

Protected Proprietary Information, connecting the law firm to dozens of Cabot customers to whom

Stoltmann never would have had any access, if not for Ms. Werts.

**ANSWER:** Stoltmann denies the allegations in this paragraph.

### Stoltmann Knew that it was Making Ms. Werts Breach the Cabot Contract and Violate Cabot's Customers' Privacy

100.   There can be no doubt that Stoltmann knew that (1) the Contract between Ms. Werts and

Cabot existed and (2) the Contract prohibited Ms. Werts from misappropriating, divulging, or

otherwise abusing Cabot's Protected Proprietary Information, including its customer lists and

customers' contact information.

**ANSWER:** Stoltmann denies the allegation in this paragraph.

101.   Stoltmann advertises its "combined 35 years of experience fighting for investor rights" and

"successful[] prosecut[ion of] well over a thousand FINRA arbitration cases and lawsuits on behalf

of defrauded investors." See Stoltmann Law (Mar. 27, 2023), https://stoltmannlaw.com/.

**ANSWER:** Stoltmann's website is a writing that speaks for itself and any allegation inconsistent therewith is hereby denied.

102.   Stoltmann also claims that its attorneys "have dedicated their life's work to representing

investors who have been cheated or defrauded by those professionals they trusted with their hard-

earned money and retirement savings, recovering in excess of $50 million for investors over the

years."

**ANSWER:** Stoltmann's website is a writing that speaks for itself and any allegation inconsistent therewith is hereby denied.

103.   Stoltmann further boasts that it "exclusively represents investors from across the country in

securities litigation and arbitration actions including claims for fraud, unsuitable investment recommendations, excessive trading, churning, unauthorized trading, breach of fiduciary duty, and misrepresentations and omissions."

> **ANSWER:** Stoltmann's website is a writing that speaks for itself and any allegation inconsistent therewith is hereby denied.

104. Besides those classic securities customer claims, Stoltmann also claims to represent "individuals and business in contract disputes in all areas of business and for business of all sizes," explaining, "[t]ypically[,] a breach of contract occurs when a party fails to perform under the terms of the contract."

> **ANSWER:** Stoltmann's website is a writing that speaks for itself and any allegation inconsistent therewith is hereby denied.

105. Stoltmann purports to practice "Intellectual Property" law, explaining, "[w]e can help you register, protect, license, and enforce your business's intellectual property rights."

> **ANSWER:** Stoltmann's website is a writing that speaks for itself and any allegation inconsistent therewith is hereby denied.

106. Stoltmann also offers to represent plaintiffs in "Business Tort Litigation," which Stoltmann defines as "claims that are business disputes that are not contract-based. Business torts provide the common law rules on liability that arise out of business transactions such as interference with economic or business relationships."

> **ANSWER:** Stoltmann's website is a writing that speaks for itself and any allegation inconsistent therewith is hereby denied.

107. Finally, Stoltmann also advertises its "Employment Law" practice by claiming, "Our firm helps employees navigate complex legal matters by providing them with expert legal advice on all

21

issues related to the workplace."

    **ANSWER:** Stoltmann's website is a writing that speaks for itself and any allegation inconsistent therewith is hereby denied.

108.  In short, Stoltmann's own website compels the conclusions that Stoltmann knew (1) Ms. Werts had a Contract with Cabot, (2) that Contract prohibited Ms. Werts from sharing Cabot's Protected Proprietary Information with anyone, and (3) the Contract even more specifically prohibited Ms. Werts from helping Stoltmann abuse Cabot's Protected Proprietary Information in order to attack Cabot.

    **ANSWER:** Stoltmann's website is a writing that speaks for itself and any allegation inconsistent therewith is hereby denied.

109.  FINRA registered representatives generally enter into written contracts with FINRA member firms.

    **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegation in this paragraph.

110.  Those contracts uniformly include provisions that prohibit registered representatives from (1) divulging, abusing, or otherwise profiting from brokerage firms' Protected Proprietary Information, including firms' customers' information or (2) interfering with firms' customer relationships.

    **ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegations in this paragraph.

111.  Indeed, these contracts' provisions are so notorious that they caused the creation of the Broker Protocol, continued to exist while the Protocol was widely adopted, and, at this point, have outlived the Protocol.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegations in this paragraph.

112. In any event, the Protocol never allowed registered representatives to take more than the five pieces of specifically-enumerated information, let alone export all files held by a representative's former firm.

**ANSWER:** The Broker Protocol is a writing that speaks for itself and any assertion inconsistent therewith is hereby denied.

113. Nor did the Protocol ever allow representatives to use that information for any purpose but to attempt to bring customers over to their new brokerage firms.

**ANSWER:** The Broker Protocol is a writing that speaks for itself and any assertion inconsistent therewith is hereby denied.

114. The Protocol certainly never allowed or encouraged representatives to steal confidential or proprietary information and hand it to people who would abuse that information against the originating firm.

**ANSWER:** The Broker Protocol is a writing that speaks for itself and any assertion inconsistent therewith is hereby denied.

115. There can be no doubt that with "35 years of experience" prosecuting "well over a thousand FINRA arbitration cases and lawsuits on behalf of defrauded investors," Stoltmann knew that the Contract prohibited Ms. Werts from misappropriating Cabot's Protected Proprietary Information.

**ANSWER:** Stoltmann denies the allegations contained in this paragraph.

116. Moreover, Stoltmann had specific knowledge of this particular Contract because Ms. Werts and / or her agents, including her personal attorneys, told Stoltmann about the Contract.

**ANSWER:** Stoltmann denies the allegations contained in this paragraph.

117.   By encouraging Ms. Werts to breach the Contract, Stoltmann violated Illinois Rule of Professional Conduct 4.4, which states that "[i]n representing a client, a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of [third] person[s]."

> **ANSWER:** Stoltmann denies it encouraged Ms. Werts to breach the Contract. The remaining allegations in this paragraph constitute conclusions of law to which no response is required.

118.   Stoltmann also violated Illinois Rule of Professional Conduct 7.3, which states that "[a] lawyer shall not by in–person, live telephone or real–time electronic contact solicit professional employment when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain."

> **ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required.

119.   Accordingly, Cabot sues Stoltmann.

> **ANSWER:** Stoltmann admits it has been sued by Cabot.

## **CLAIMS**

### **COUNT I**
### **Federal Defend Trade Secrets Act**

120.   Cabot repeats its foregoing allegations.

> **ANSWER:** Stoltmann repeats its foregoing responses.

121.   Cabot's Protected Proprietary Information includes "trade secrets" as defined by the Defend Trade Secrets Act.

> **ANSWER:** The allegation in this paragraph constitutes a conclusion of law to which no response is required.

122.   Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary

24

Information.

> **ANSWER:** Stoltmann denies the allegation contained in this paragraph.

123.  In doing so, Stoltmann has caused Cabot irreparable harm that warrants injunctive relief, as well as damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

> **ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required.

**COUNT II**
**Colorado Uniform Trade Secrets Act**

124.  Cabot repeats its foregoing allegations.

> **ANSWER:** Stoltmann repeats its foregoing responses.

125.  Cabot's Protected Proprietary Information includes "trade secrets" as defined by the Colorado Uniform Trade Secrets Act.

> **ANSWER:** The allegation in this paragraph constitutes a conclusion of law to which no response is required.

126.  Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

> **ANSWER:** Stoltmann denies the allegation contained in this paragraph.

127.  In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

> **ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required.

## COUNT III
## Delaware Uniform Trade Secrets Act

128. Cabot repeats its foregoing allegations.

**ANSWER:** Stoltmann repeats its foregoing responses.

129. Cabot's Protected Proprietary Information includes "trade secrets" as defined by the Delaware Uniform Trade Secrets Act.

**ANSWER:** The allegation in this paragraph constitutes a conclusion of law to which no response is required.

130. Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

131. In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

**ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required

## COUNT IV
## Illinois Uniform Trade Secrets Act

132. Cabot repeats its foregoing allegations.

**ANSWER:** Stoltmann repeats its foregoing responses.

133. Cabot's Protected Proprietary Information includes "trade secrets" as defined by the Illinois Uniform Trade Secrets Act.

**ANSWER:** The allegation in this paragraph constitutes a conclusion of law to which no response is required.

134. Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary

26

Information.

 **ANSWER:** Stoltmann denies the allegation contained in this paragraph.

135. In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

 **ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required.

**COUNT V**
**Tortious Interference with Contract**

136. Cabot repeats its foregoing allegations.

 **ANSWER:** Stoltmann repeats its foregoing responses.

137. Stoltmann knew that Ms. Werts was contractually obligated to protect Cabot's Protected Proprietary Information.

 **ANSWER:** Stoltmann denies the allegation contained in this paragraph.

138. Yet Stoltmann induced Ms. Werts into providing Cabot's Protected Proprietary Information in violation of the Contract.

 **ANSWER:** Stoltmann denies the allegation contained in this paragraph.

139. In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

 **ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required.

**COUNT VI**
**Tortious Interference with Business Relations**

140. Cabot repeats its foregoing allegations.

 **ANSWER:** Stoltmann repeats its foregoing responses.

27

141.  Stoltmann knew that Ms. Werts was contractually obligated to protect Cabot's Protected Proprietary Information.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

142.  Yet Stoltmann induced Ms. Werts into providing Cabot's Protected Proprietary Information in violation of the Contract.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

143.  Then, Stoltmann reached out to Cabot's customers to encourage them to attempt to hold Cabot liable for their losses instead of the two parties who could possibly bear such responsibility: GWG, which failed and filed for bankruptcy, and Ms. Werts, who solicited each customer's investment in the GWG L Bonds and pocketed approximately 90% of the profits.

**ANSWER:**  Stoltmann admits it represents Cabot Lodge clients who sued only Cabot Lodge and not Ms. Werts.  Stoltmann admits that Ms. Werts, while employed and supervised by Cabot Lodge, solicited each customer's investment in GWG L Bonds. Stoltmann lacks knowledge sufficient to admit or deny whether Ms. Werts "pocketed approximately 90% of the profits."  Stoltmann denies the remaining allegations contained in this paragraph.

144.  Stoltmann had no good basis to poison Cabot's relationships with its customers.

**ANSWER:** Stoltmann lacks sufficient knowledge to admit or deny the allegations contained in this paragraph.

145.  In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

**ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required.

28

## COUNT VII
## Misappropriation

146.  Cabot repeats its foregoing allegations.

**ANSWER:** Stoltmann repeats its foregoing responses.

147.  Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

148.  Stoltmann did so in order to deprive Cabot of its priceless information and use it for Stoltmann's own pecuniary gain.

**ANSWER:** Stoltmann denies the allegations contained in this paragraph.

149.  In doing so, Stoltmann has damaged Cabot in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

**ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required.

## COUNT VIII
## Conversion

150.  Cabot repeats its foregoing allegations.

**ANSWER:** Stoltmann repeats its foregoing responses.

151.  Stoltmann induced Ms. Werts into misappropriating Cabot's Protected Proprietary Information.

**ANSWER:** Stoltmann denies the allegation contained in this paragraph.

152.  Stoltmann did so in order to deprive Cabot of its priceless information and use it for Stoltmann's own pecuniary gain.

**ANSWER:** Stoltmann denies the allegations contained in this paragraph.

153.  In doing so, Stoltmann has damaged CLS in an amount to be revealed during discovery, proven at trial, and currently believed to exceed $1,175,000.

**ANSWER:** The allegations in this paragraph constitute conclusions of law to which no response is required.

## DEFENSES

### COUNT I
### Federal Defend Trade Secrets Act

1.  Plaintiff has failed to state a claim upon which relief may be granted.

2.  Plaintiff has failed to allege with adequate specificity (a) trade secrets; (b) the misappropriation by Stoltmann; and (c) damages.

3.  Client identities and contact information do not constitute trade secrets for financial services firms under applicable law.

4.  Plaintiff has not taken reasonable measures to maintain the secrecy of the trade secrets alleged to exist in this matter.

5.  Plaintiff will be unable to establish a causal relationship between the alleged misappropriation and the damages pled.

6.  The alleged Protected Proprietary Information was publicly available and thus cannot be considered to be trade secrets.

### COUNT II
### Colorado Uniform Trade Secrets Act

1.  Plaintiff has failed to state a claim upon which relief may be granted.

2.  Plaintiff has failed to allege with adequate specificity (a) trade secrets; (b) the misappropriation by Stoltmann; and (c) damages.

30

3. Client identities and contact information do not constitute trade secrets for financial services firms under applicable law.

4. Plaintiff has not taken reasonable measures to maintain the secrecy of the trade secrets alleged to exist in this matter.

5. Plaintiff will be unable to establish a causal relationship between the alleged misappropriation and the damages pled.

6. The alleged Protected Proprietary Information was publicly available and thus cannot be considered to be trade secrets.

7. The Colorado Uniform Trade Secrets Act does not apply to the facts of this case.

## COUNT III
## Delaware Uniform Trade Secrets Act

1. Plaintiff has failed to state a claim upon which relief may be granted.

2. Plaintiff has failed to allege with adequate specificity (a) trade secrets; (b) the misappropriation by Stoltmann; and (c) damages.

3. Client identities and contact information do not constitute trade secrets for financial services firms under applicable law.

4. Plaintiff has not taken reasonable measures to maintain the secrecy of the trade secrets alleged to exist in this matter.

5. Plaintiff will be unable to establish a causal relationship between the alleged misappropriation and the damages pled.

6. The alleged Protected Proprietary Information was publicly available and thus cannot be considered to be trade secrets.

7. The Delaware Uniform Trade Secrets Act does not apply to the facts of this case.

## COUNT IV
## <u>Illinois Uniform Trade Secrets Act</u>

1.  Plaintiff has failed to state a claim upon which relief may be granted.

2.  Plaintiff has failed to allege with adequate specificity (a) trade secrets; (b) the misappropriation by Stoltmann; and (c) damages.

3.  Client identities and contact information do not constitute trade secrets for financial services firms under applicable law.

4.  Plaintiff has not taken reasonable measures to maintain the secrecy of the trade secrets alleged to exist in this matter.

5.  Plaintiff will be unable to establish a causal relationship between the alleged misappropriation and the damages pled.

6.  The alleged Protected Proprietary Information was publicly available and thus cannot be considered to be trade secrets.

7.  The Illinois Uniform Trade Secrets Act does not apply to the facts of this case.

## COUNT V
## <u>Tortious Interference with Contract</u>

1.  Plaintiff has failed to state a claim upon which relief may be granted.

2.  Stoltmann was unaware of any contractual relationship between plaintiff and others that it ostensibly interfered with.

3.  Stoltmann did not intend to induce a breach of contract between plaintiff and others.

4.  Stoltmann did not unjustifiably induce a breach of contract between plaintiff and others.

5.  Plaintiff failed to specify any contracts that were breached between it and others as a result of Stoltmann's conduct.

6.  Plaintiff will be unable to establish a causal connection between Stoltmann's conduct and any ostensible breach of contract between Plaintiff and others.

7.  This cause of action is precluded by Plaintiff's trade secrets act causes of action.

## COUNT VI
## Tortious Interference with Business Relations

1.  Plaintiff has failed to state a claim upon which relief may be granted.

2.  Stoltmann was unaware of any business expectancy between plaintiff and others that it ostensibly interfered with.

3.  Stoltmann did not intend to interfere with any business expectancy between plaintiff and others.

4.  Stoltmann did not maliciously interfere with any business expectancy between plaintiff and others.

5.  Any ostensible interference with a business expectancy between plaintiff and others caused by Stoltmann's conduct was justified.

6.  Plaintiff failed to specify any business expectancies that were interfered with between it and others as a result of Stoltmann's conduct.

7.  Plaintiff will be unable to establish a causal connection between Stoltmann's conduct and any ostensible interference with business expectancies of Plaintiff.

8.  This cause of action is precluded by Plaintiff's trade secrets act causes of action.

## COUNT VII
## Misappropriation

1.  Plaintiff has failed to state a claim upon which relief may be granted.

2.  There is no independent cause of action for misappropriation under applicable law.

## VIII
## Conversion

1. Plaintiff has failed to state a claim upon which relief may be granted.

2. Stoltmann never possessed or assumed ownership, dominion or control over the Protected Proprietary Information.

3. Plaintiff never demanded return of the Protected Proprietary Information.

4. The Protected Proprietary Information was publicly available.

5. This cause of action is precluded by Plaintiff's trade secret act causes of action.

## JURY DEMAND

Defendant Stoltmann demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Stoltmann denies that Plaintiff is entitled to any of the relief sought through the Complaint and respectfully requests that the court dismiss the Complaint in its entirety and enter judgment in his favor against Plaintiff.

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this answer: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the answer otherwise complies with the requirements of Rule 11.

LEWITAS HYMAN PC

Dated: January 9, 2024

_____
Bruce Lewitas
Bar No. 6208422

Attorney for Defendant
Lewitas Hyman PC
161 North Clark Street, Suite 1600
Chicago, IL  60601
blewitas@securitieslaw.com
dhyman@securitieslaw.com
Telephone: (312) 291-4603